IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

DANIEL OLAF BERTELSON,

Appellant.

No. 88142-6-I

DIVISION ONE

UNPUBLISHED OPINION

HAZELRIGG, C.J. — Daniel Bertelson appeals from his conviction after jury trial of one count of unlawful possession of a firearm in the first degree. He contends that ineffective assistance of counsel regarding a stipulation that addressed the prior disqualifying offense deprived him of a fair trial. While trial counsel's performance was plainly deficient because there was no reasonable tactical reason to provide the details of the disqualifying offense in the stipulation that was provided to the jury, in light of the other evidence adduced at trial, Bertelson fails to establish that he was prejudiced such that reversal is required. Accordingly, we affirm.

FACTS

On July 21, 2024, officers from the Port Angeles Police Department (PAPD) and Lower Elwah Klallam Tribal Police Department responded to a 911 report of a possible firearm violation. PAPD Officer Kyle Buchanan later indicated in the probable cause affidavit he submitted in this case that the reporting party, Amanda

Carter,[1] had informed dispatch she had observed children using fireworks and that they had started a fire along highway 101. Buchanan took Carter's statement at the scene before contacting Daniel Bertelson outside his trailer across the street from Carter's. Buchanan later testified that as he and Bertelson walked toward the entrance to his trailer, Bertelson "lean[ed] down to grab something" and Buchanan then noticed "shell casings in the gravel leading up to the trailer." When Buchanan asked why there were brass shell casings in his driveway, he said that Bertelson responded that they "must have came in [sic] with the new gravel that he ordered."

When the pair approached the entrance to Bertelson's trailer, Buchanan said he noticed another shell casing and observed Bertelson "put his right foot over the brass—over the shell casing." Buchanan testified that Bertelson said that "he must have kicked it up from the gravel" and ultimately denied discharging a firearm. After Bertelson's partner, Tiffany Sackmaster,[2] declined to speak with Buchanan, he conducted a records check on Bertelson and learned that Bertelson had a prior felony conviction. At that point, Buchanan detained Bertelson while Buchanan applied for a search warrant for the trailer. Buchanan explained that when he advised Bertelson that he had obtained a warrant to search his trailer, Bertelson told Buchanan that he would "just tell [Buchanan] where the firearm [wa]s to make things easy."

---

[1] Carter is identified throughout the record by another name, but at the start of her testimony, the deputy prosecutor confirmed on the record both that she is known by others and prefers to be referred to as Amanda Carter. Accordingly, that is how we refer to her.

[2] While various witnesses referred to Sackmaster as Bertelson's wife, at the start of her direct examination in response to a question about her relationship to Bertelson, Sackmaster asserted, "[W]e're partners but we're not married."

Buchanan then recorded himself as he read Bertelson his *Miranda*[3] warnings before taking Bertelson's statement regarding the location of the firearm in the trailer. Buchanan then located a .40 caliber pistol on one of the bench seats adjacent to the table in the main living area of the trailer as Bertelson had described. When Buchanan secured the firearm, the magazine was loaded. After concluding that he had probable cause to arrest Bertelson for unlawful possession of a firearm in the second degree and discharging a firearm, Buchanan placed Bertelson under arrest and transported him to the Clallam County Jail.

Three days later, on July 24, the State charged Bertelson with one count of unlawful possession of a firearm in the first degree (UPF1). Twice prior to the start of trial, the State amended the information and Bertelson ultimately proceeded to trial on one count of UPF1 and three counts of tampering with a witness. At trial confirmation, the State advised the court that in addition to proposed jury instructions and additional motions in limine, the parties had a stipulation under *Old Chief v. United States*[4] that they would present.

Trial was conducted over two days in April 2025. Just prior to jury selection, parties discussed their proposed stipulation regarding the disqualifying felony conviction that resulted in the loss of Bertelson's firearm rights. After explaining the elements the State was required to prove for the UPF1 charge and the purpose of an *Old Chief* stipulation, the trial court rejected the proposed stipulation at that point, and directed that defense counsel speak with Bertelson about the issue because, the judge indicated, he did not "want to build an error into this thing right

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[4] 519 U.S. 172 (1997).

from the get-go." The trial court then instructed the members of the venire and conducted its initial inquiry, after which it returned to the question of the specific language of the proposed stipulation regarding the disqualifying conviction, and Bertelson's attorney stated that his "intention ha[d]n't changed about that at this point."

The State presented testimony from Buchanan, PAPD Officer Dan Morse, and Carter, and the defense then moved to dismiss the witness tampering charges in counts 2 through 4, but the trial court denied the motion. During his case-in-chief, Bertelson testified in his own defense and offered the testimony of Sackmaster and two other civilian witnesses. At the start of the second day of trial, before resting, Bertelson renewed his motion to dismiss and reiterated the defense position that the State had failed to carry its burden of proof as to those charges, but the judge again denied the motion. The jury returned with a verdict that afternoon; Bertelson was convicted of UPF1 but acquitted of all three counts of witness tampering.

Roughly a week later, Bertelson filed a motion to arrest judgment, again challenging the sufficiency of the evidence, and sought dismissal of the UPF1.[5] At the sentencing hearing that followed on April 22, the trial court clarified that Bertelson was presenting as-applied constitutional challenges to the disarming statutes based on United States Supreme Court precedent, heard argument from the parties, and denied the motion. The trial court rejected the defense request for

---

[5] While defense counsel captioned the motion simply as one "to dismiss" and referenced CrR 4.7(a)(3), that rule addresses the State's discovery obligations, whereas CrR 7.4(a)(3) sets out the procedure for a defense motion to arrest judgment based on "insufficiency of the proof of a material element of the crime."

a prison-based drug offender sentencing alternative, followed the State's recommendation and alternate request of the defense, and imposed a low-end sentence of 26 months in prison. The judge exercised his discretion based on Bertelson's criminal history and imposed a requirement in the judgment and sentence that Bertelson register as a felony firearm offender, pursuant to RCW 9.41.010 and .330, for a period of four years after release from custody.

Bertelson timely appealed.

## ANALYSIS

In his sole assignment of error on appeal, Bertelson contends that his trial counsel's performance regarding the stipulation to the fact of the prior disqualifying conviction was deficient such that he was deprived of a fair trial and, on that basis, reversal is required. In order to establish entitlement to reversal on the grounds of ineffective assistance of counsel (IAC), the defendant must prove both that counsel's performance was deficient and that such deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987); *State v. Cienfuegos*, 144 Wn.2d 222, 226, 23 P.3d 1011 (2001). The defendant must satisfy both prongs of the *Strickland* test or their IAC challenge fails. *Thomas*, 109 Wn.2d at 225-26; *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996), *overruled on other grounds by Casey v. Musladin,* 549 U.S. 70 (2006).

I.      Deficient Performance

To satisfy the first step of the *Strickland* test for IAC, the defendant must establish that, "considering all the circumstances," counsel's performance "fell below an objective standard of reasonableness."  466 U.S. at 688.  In *Strickland*, the United States Supreme Court cautioned reviewing courts that

> [j]udicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *See Michel v. Louisiana*, 350 U.S. [91,] 101 [(1955)].  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. at 689.  In *State v. McFarland*, our Washington State Supreme Court explained that "[b]ecause the presumption [under *Strickland*] runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel."  127 Wn.2d 322, 336, 899 P.2d 1251 (1995).  *McFarland* further holds that the "presumption of effective representation can be overcome only by a showing of deficient representation *based on the record established in the proceedings below*."  *Id*. (emphasis added).  Bertelson has made such a showing here.

The issue before us is whether defense counsel's agreement to the language in the stipulation provided to the jury that included the fact of the precise crime of conviction that resulted in Bertelson's loss of firearm rights constituted

IAC. The stipulation was jointly presented, signed by Bertelson, his defense counsel, and the deputy prosecuting attorney (DPA), and filed with the court. The DPA read it into the record at the conclusion of the State's direct examination of Buchanan. The stipulation read as follows:

> The parties have agreed that certain facts are true. You must accept as true that the person before the court, who has been identified in the charging document as Defendant, Daniel O[.] Bertelson, was convicted on July 17, 1998 of Conspiracy to Deliver a Controlled Substance while armed with a deadly weapon, a serious offense, in State of Washington v. Daniel Olaf Bertelson, Clallam County Superior Court Cause No. 98-1-00111-7.
> The stipulation is to be considered evidence only of the prior conviction element. You are not to speculate as to the nature of the prior conviction. You must not consider the stipulation for any other purpose.

Here, the parties had advised the court at trial confirmation that they intended to provide a stipulation under *Old Chief*. In that case, Old Chief was charged in federal court with possession of a firearm after having lost that right as a result of a prior felony conviction, and he offered to stipulate to the element regarding the disqualifying prior conviction on the basis that the "name and nature" of that crime created the risk that the jury would not "hold the [g]overnment to its burden of proof beyond a reasonable doubt" on the pending charges. *Id*. at 174-75. He argued that his offer to stipulate rendered evidence of the "name and nature of the offense inadmissible" under the Federal Rules of Evidence because the danger of "unfair prejudice from that evidence would substantially outweigh its probative value," and he proposed a jury instruction regarding his proposed stipulation. *Id*. at 175. The Assistant United States Attorney refused to join the stipulation and argued the government had the right to prove its case as it saw fit.

*Id.* at 177. The district court and Ninth Circuit Court of Appeals agreed. *Id*. However, the Supreme Court disagreed and reversed. *Id*. at 178. The majority reasoned that while there are valid considerations regarding the government's ability to seek to prove its case with the (admissible) evidence it chooses, its

> recognition that the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story has, however, virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against [them].

*Id*. at 190. It further noted,

> The issue of substituting one statement for the other normally arises only when the record of conviction would not be admissible for any purpose beyond providing status, so that excluding it would not deprive the prosecution of evidence with multiple utility; if, indeed, there were a justification for receiving evidence of the nature of prior acts on some issue other than status. . . . [Federal] Rule [of Evidence] 404(b) guarantees the opportunity to seek its admission.

*Id*. Finally, the Court explained that "[g]iven these peculiarities of the element of felony-convict status and of admissions and the like when used to prove it," the general rule[6] for the exclusion of otherwise relevant evidence on the basis of prejudice applies, whether its probative value is outweighed by the risk it carries of unfair prejudice. *Id*.; ER 403.

The trial court here plainly understood the purpose of an *Old Chief* stipulation: to allow an accused to admit to an essential element of the charged crime, one that the State otherwise carries the burden to prove beyond a reasonable doubt, in order to minimize the possibility of prejudice that may result from the "name or nature" of certain crimes of conviction. From the moment the

---

[6] *Old Chief* necessarily cited Federal Rule of Evidence 403, but the language of that rule is virtually identical to Washington's ER 403.

parties presented their proposed stipulation, the judge made clear that it need include only the fact that Bertelson had previously been convicted of "a serious offense" and expressly noted that he "would leave off the conspiracy to deliver [a] controlled substance while armed with a deadly weapon." The court repeatedly inquired of defense counsel whether he truly desired to have the name of the disqualifying conviction included and even repeated the statutory elements of UPF1 in his attempt to explain to the parties that the State only needed to prove that Bertelson had been previously convicted of a serious offense, not specifically what that serious offense was. The judge expressly stated,

> [T]he [c]ourt would be prepared to grant a stipulation that simply removes the . . . conspiracy to deliver a controlled substance while armed with a deadly weapon language and just say ["]was convicted of a serious offense in the State of Washington.["]

When the DPA confusingly asserted that the parties had "realized one way or another the nature of the offense would end up coming in," the judge interrupted and asked why the State believed the nature of the offense, or even that it was a serious offense, would come in. When the DPA insisted, based on the pattern jury instruction, that the "title of the offense would still be coming in to prove the serious offense," the judge explained that would not be true if Bertelson stipulated that "he's committed the serious offense." The judge continued and clarified,

> I don't think that would come in—*I would not allow that in front of a jury.* I think it's—could be prejudicial—
> . . . .
> —far more than probative. It's not an element of the crime, and so, [defense counsel], do you want a second to talk to your client about this . . . . I'm going to hand back the stipulation for you to . . . think about a bit.

(Emphasis added.)

The judge advised the parties that "in front of the jury in voir dire [he was] *simply going to inform them there's proof* [*Bertelson*]*'s been convicted of a serious offense*" and explained that he was doing this because he "d[id]n't want to *build an error into this thing right from the get-go*." (Emphasis added.) Nonetheless, when the trial court later inquired of defense counsel whether he had "any additional thought[s] about the stipulation," Bertelson's attorney answered that his "intention ha[d]n't changed about that." The State read the stipulation into the record after it had presented direct testimony from Buchanan and before defense counsel began his cross-examination.

Confoundingly, however, when the parties discussed jury instructions the following day, defense counsel indicated that he was not sure whether "including the nature of the charge in the [read] stipulation was necessary" and simply stating it was a "serious offense would be adequate" in the instructions. The court then explained "that was the point up front in . . . that discussion" the previous day regarding the level of detail to be included in the stipulation and noted that it "gave everybody a chance to think about it." The judge again reiterated, "[T]he point of an *Old Chief* stipulation is I believe to avoid a discussion of the nature of the prior offense and not have a jury speculate about that." (Italics added.) Finally, the judge stated that he "continue[d] to have concerns about this" and reasoned that "what [they had] done so far was by stipulation, agreement and discussion so [he could not] unring that bell . . . as it were" but he could exclude the name of the disqualifying conviction from the jury instruction regarding the stipulation.

The "to convict" instruction, provided to the jury in instruction no. 7, indicated that in order to convict Bertelson of UPF1 as charged in count 1, the State was required to prove beyond a reasonable doubt each of the following elements:

(1) That on or about July 21, 2024, the defendant knowingly had a firearm in his possession or control;
(2) That the defendant had previously been convicted of a serious offense; and
(3) That the possession or control of the firearm occurred in the State of Washington.

As to the stipulation the DPA read into the record regarding the second element of UPF1, jury instruction no. 12 stated,

The parties have agreed that certain facts are true. You must accept as true that the person before the court, who has been identified in the charging document as Defendant, Daniel O. Bertelson, was convicted of a serious offense, in *State of Washington v. Daniel Olaf Bertelson*, Clallam County Superior Court Cause No. 98-1-00111-7.
The stipulation is to be considered evidence only of the prior conviction element. You are not to speculate as to the nature of the prior conviction. You must not consider the stipulation for any other purpose.

The "record established in the proceedings below" amply demonstrates that Bertelson's trial counsel was deficient in his handling of the *Old Chief* stipulation. *See McFarland*, 127 Wn.2d at 336 ("The presumption of effective representation can be overcome only by a showing of deficient representation based on the record established in the proceedings below.").

First, viewing the stipulation and jury instruction no. 12 together, it is apparent that counsel mistakenly believed that the stipulation must follow the language of the jury instruction. That is the only possible explanation for the confusing inclusion of the sentence "You are not to speculate as to the nature of

the prior conviction" two sentences after precisely setting out the details of that prior conviction. Second, the record establishes that the DPA was as confused about the purpose and content of an *Old Chief* stipulation as defense counsel was, despite the trial court's myriad efforts to educate them.[7] Third and most critically, after the trial judge expressly stated that the "name and nature" of Bertelson's disqualifying conviction could be "prejudicial—far more than probative" and, on that basis, "would not allow that in front of a jury" and even went so far as to hand the stipulation back to counsel with instructions to confer with his client and think about the issue further.

The trial court was correct that the State was not required to prove the specifics of the prior disqualifying offense, only that it was a serious offense. By providing a stipulation signed by the accused, in a trial on a UPF1 charge that admits to a prior conviction for "Conspiracy to Deliver a Controlled Substance *while armed with a deadly weapon*," defense counsel agreed to the admission of otherwise presumptively inadmissible other act evidence as governed by ER 404(b). (Emphasis added.) ER 404(b) protects accused persons from the impact of what is commonly referred to as propensity evidence; that which is used to "prove the character of a person in order to show action in conformity therewith." The danger inherent in the improper admission of propensity evidence is so great that trial court judges must conduct their analysis underlying such rulings on the record so as to facilitate appellate review. *See, e.g., State v. Jackson*, 102 Wn.2d

---

[7] We take this opportunity to laud the trial judge's patient and thoughtful efforts to not only clarify the controlling law for the parties, both as to the elements the State was required to prove at trial and the goal and utility of a stipulation under *Old Chief*, but also protect the integrity of the proceedings.

689, 693, 689 P.2d 76 (1984); *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986); *State v. Brown*, 132 Wn.2d 529, 571, 940 P.2d 546 (1997); *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007); *State v. Gunderson*, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014).

On this record, there is no legitimate trial tactic to provide this prejudicial information to the jury. The State argues in briefing that "disclosing the underlying offense to avoid speculation and to focus the jury on the issue in dispute are conceivable trial strategies." (Boldface omitted.) First, while the phrase "conceivable trial strategies" has occasionally been used in Washington case law on this topic, the origin of that language is easily traced to a line in our state Supreme Court's opinion in *State v. Aho*.[8] 137 Wn.2d 736, 975 P.2d 512 (1999). There, the court explained,

> Counsel's performance was deficient. Although *legitimate trial strategy or tactics* cannot be the basis for an ineffectiveness of counsel claim, there is no conceivable legitimate tactic where the only possible effect of deficient performance was to allow the possibility of a conviction of a crime under a statute which did not exist and could not be applied during part of the charging period. Prejudice here is obvious.

*Id*. at 745-46 (emphasis added) (citation omitted). Read in context, it is clear that our state's highest court was not modifying the test from *Strickland*, not that it could, but rather, commenting on its application of that test to the facts before it. *Strickland* directs appellate courts to identify "*reasonable* professional assistance" and consider whether "the challenged action 'might be considered *sound* trial

---

[8] It is also found in an earlier Washington Supreme Court opinion, *State v. Adams*, but that case predates *Strickland*, so could not be construed as interpreting that test. 91 Wn.2d 86, 90, 586 P.2d 1168 (1978).

strategy.'" 466 U.S. at 689 (emphasis added) (quoting *Michel,* 350 U.S. at 101). *McFarland* instructs us to consider any "*legitimate* strategic or tactical reasons supporting the challenged conduct by counsel." 127 Wn.2d at 336 (emphasis added). The question before us is not whether defense counsel's approach was conceivable but if it was "reasonable," "sound," or "legitimate." Second, to hold, as the State suggests, that the prevention of speculation about the underlying offense is a valid strategic reason to include details of the disqualifying conviction that the State is not required to prove, would undercut the very reasoning of *Old Chief*. More to the point, though, the State argues that Bertelson cannot prove prejudice because instruction no. 12 directed jurors that they were "not to speculate as to the nature of the prior conviction" and our jurisprudence presumes that jurors follow the instructions of the court. *See State v. Kalebaugh*, 183 Wn.2d 578, 586, 355 P.3d 253 (2015). That same presumption then necessarily obviates the need to include the details of the underlying conviction out of fear that the jury may speculate because the plain language of both the stipulation and jury instruction prohibited them from doing so.

Trial counsel's performance regarding the *Old Chief* stipulation was plainly deficient. Accordingly, we turn to the question of prejudice.

II.     Prejudice

Our Supreme Court has reiterated that the *Strickland* test also "requires the defendant to prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "A reasonable probability

is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In *Hendrickson*, our Supreme Court considered the prejudicial effect of improperly admitted evidence of the defendant's conviction history and explained,

> [T]he prejudicial effect of the jury's knowledge of Hendrickson's two prior drug convictions is viewed against the backdrop of the evidence in the record. The evidence in the record powerfully supports Hendrickson's guilt on the delivery count. On this record, we cannot state that the result of the trial court would have been different had the evidence of the prior drug convictions not been admitted. Hendrickson was not prejudiced.

129 Wn.2d at 80. Like Hendrickson, Bertelson rests his IAC claim on the improper presentation of the precise crime of conviction that disqualified him from lawfully possessing the firearm in question in the instant case; a crime that carried particular weight in light of the charges at issue in the trial. There, the court concluded that because the evidence at trial "powerfully support[ed] . . . guilt," Hendrickson had failed to establish prejudice such that he did not prevail on his claim of IAC.

Here, Carter testified that she had been a neighbor of Bertelson's for several years and they lived across the street from each other at the time of the incident in question.[9] She explained that she heard fireworks on the evening of July 21, 2024 and went outside to see what was happening; there was a fire in the field on the other side of the fence adjacent to the community in which she and Bertelson resided. Carter said she was concerned that the fire "would jump the fence and start . . . a bigger fire in the park" and noticed Bertelson standing in the yard when

---

[9] Carter testified that Bertelsen had been her next-door neighbor before he moved across the street.

she ran outside.  As to the firearm charge, she testified on direct examination as follows:

> [CARTER:]  I was concerned with the red glow—it was a fire obviously, but I ran out and I saw him standing there (completely inaudible) with his hands up in the air with a gun in his hands [sic] and just shot four rounds off.
>
> [STATE:] Okay.  Where were you—were you, um—
>
> [CARTER:] I was approximately right here, probably less than 50 feet away from him at the time.
> . . . .
> But when I came out my door I was running toward the fire like I say, and I hollered at him, you know, maybe put the gun away and help me put the fire out.
>
> [STATE:] Okay.  What did he do?
>
> [CARTER:] He went inside.
> . . . .
> And closed the door.
>
> [STATE:] Where was his hand when you were yelling at him?
>
> [CARTER:] Straight up in the air.  He was still standing like the Statute of Liberty with the gun straight up in the air.

Carter went on to describe that she made eye contact with Bertelson during this encounter, recounted the interaction for law enforcement on the scene, and provided a written statement.

Buchanan also testified about his actions related to this incident, including interviewing Carter before he contacted Bertelson at his trailer.  Buchanan described the discovery of the brass shell casings in the gravel leading up to Bertelson's trailer, Bertelson's explanation that they must have been mixed in with the gravel that had recently been delivered, and Bertelson's attempt to cover another brass shell casing with his foot as they moved toward the door of the trailer.

- 16 -

Buchanan explained that he conducted a records check on Bertelson, learned of his felony conviction history and, after Bertelson again contended that he did not discharge a firearm, Buchanan detained him. Buchanan recounted applying for the search warrant for Bertelson's trailer, Bertelson's offer to "make things easy" by telling Buchanan where the firearm was located inside the trailer, advising Bertelson of his *Miranda* warnings, and recovering the pistol from the location Bertelson had described. Buchanan noted that the pistol was in plain view "on the bench that was on the table that was in the main living area" "within ten feet" of the trailer door.

Sackmaster testified that the firearm in question was hers but later clarified that she was "in the process of buying one" on the date in question; she had not purchased the pistol at that point and "only had it for like a day or two before that all happened." She further stated that while the trailer was small and the firearm was on a bench by the table in a common area, she was the only person who had access to the firearm and noted simply, "I just had it in my normal spot where I sit at and [Bertelson] doesn't ever go into my stuff, so . . . what's mine is mine, you know, he doesn't mess with my stuff at all." Verdie Stigall, who testified that he had been friends with Bertelson for 40 years in addition to being his employer, asserted that he provided Sackmaster with the firearm at issue as a loan, but the plan was for her to purchase it from him and transfer it into her name.

Finally, Bertelson elected to testify and asserted that he never heard a firearm discharge on the night of the incident but heard children lighting fireworks nearby. He said he only saw Carter when the owner was removing people from the property

due to the fire and described his subsequent interaction with Buchanan and waiting for the search warrant. When asked by his attorney what he did when he learned that the search warrant had been issued, Bertelson explained, "I knew that [Sackmaster] was buying a gun and that *I had one in my house, I'm a felon* and so I didn't want—you know, I didn't want to be caught in possession of one." (Emphasis added.) He said that he knew where the gun was located "[b]ecause that's where [Sackmaster] was sitting. That's where she sits." However, on cross-examination, the DPA showed Bertelson a photograph of the interior of the trailer that showed, among other things, a hat that Bertelson had with him in court. He explained that he kept his hat on Sackmaster's side of the table so that it would not get dog hair on it. When the DPA asked Bertelson if he could just take his hat whenever he wanted, Bertelson said he could not and explained, "[T]he table's way too wide to reach across. I mean, there's too much stuff on—I couldn't do it, really. I'd knock stuff off the table." He finally conceded, however, "If I got up and walked around the table I could grab my hat, I suppose." The DPA asked Bertelson directly if he takes his hat from Sackmaster's side of the table if he wants to wear it, and Bertelson admitted, "I grab my hat, yes, I do." After being shown a number of photographs that Buchanan took on the night of the incident, Bertelson admitted that the spot on the bench where the firearm was recovered was near his hat, though actually closer to the common area of the trailer than his hat.

The jury was instructed on constructive, in addition to actual possession. In relevant part, instruction no. 9 explained,

> Proximity alone without proof of dominion and control is insufficient to establish constructive possession. *Dominion and*

> *control need not be exclusive to support a finding of constructive possession.*
>
> In deciding whether the defendant had dominion and control over an item, you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include *whether the defendant had the immediate ability to take actual possession of the item*.

(Emphasis added.) In his reply brief, Bertelson counters the State's argument regarding prejudice with his contention that the fact he was acquitted of three counts of witness tampering, based on allegations by Carter, establishes that the jury did not find her credible. However, the jury did not need to rely on Carter's testimony that she observed Bertelson with a firearm in order to convict him on the UPF1. His own testimony that admitted he had a gun in his house and was prohibited from possessing one due to his conviction history and the gun was kept in the same location in the trailer as his hat, a location designated as Sackmaster's but reachable and periodically accessed by him, was more than sufficient to satisfy the requirements of constructive possession as set out in jury instruction no. 9.

While trial counsel was plainly deficient as to the inclusion of unnecessary facts regarding Bertelson's prior disqualifying conviction in the stipulation provided to the jury, on these facts, there is not a reasonable probability that the verdict would have been different had Bertelson's attorney performed effectively. Accordingly, we affirm.

WE CONCUR:

Díaz, J.

Chung, J.

- 19 -